STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2020 KA 0390

STATE OF LOUISIANA

VERSUS

DAWUNE R. LEE

Judgment Rendered:  **FEB** 2 2 2021

Appealed from the
Twentieth Judicial District Court
In and for the Parish of West Feliciana
State of Louisiana
Docket Number 18-WFLN-523

Honorable William G. Carmichael, Judge Presiding

*************

| | |
|---|---|
| Samuel C. D'Aquilla<br>Stewart B. Hughes<br>Haley Major Green<br>St. Francisville, LA<br><br>Tiffany B. Ashley<br>Clinton, LA | Counsel for Appellee,<br>State of Louisiana |
| Lieu T. Vo Clark<br>Mandeville, LA<br><br>C. James Rothkamm, Jr.<br>Laura A. Signorelli<br>Baton Rouge, LA | Counsel for Defendant/Appellant,<br>Dawune R. Lee |

*************

BEFORE:  WHIPPLE, C.J., WELCH, AND CHUTZ, JJ.

**WHIPPLE, C.J.**

The defendant, Dawune R. Lee, was charged by an amended bill of information[1] with attempted second degree murder, a violation of LSA-R.S. 14:30.1 and LSA-R.S. 14:27, and pled not guilty. After a bench trial, the defendant was found guilty of the responsive offense of aggravated assault with a firearm, a violation of LSA-R.S. 14:37.4.[2] The trial court sentenced the defendant to seven years imprisonment at hard labor.[3] The trial court denied a motion to reconsider sentence filed by the defendant. The defendant now appeals, assigning as error the denial of his motion to reconsider sentence and the constitutionality of the sentence. For the following reasons, we conditionally affirm the conviction and sentence, and remand with instructions to the trial court for an evidentiary hearing.

## STATEMENT OF FACTS

On the evening of June 19, 2018, around midnight, Deputy Mike Woods and Sergeant Bryan Herrin of the West Feliciana Sheriff's Department (WFSD) were dispatched to 7149 Woodpecker Drive in St. Francisville, due to a report of gunshots being fired. When the officers arrived on the scene, they observed a black male, identified as the defendant, standing at the end of the driveway. The officers talked to witnesses at the scene, including the defendant and his sister, Tytianna Lee, who lived at the residence. The defendant advised that he had fired

---

[1] The defendant was originally charged with aggravated second degree battery, a violation of LSA-R.S. 14:34.7.

[2] The minutes indicate that the trial court found the defendant guilty of attempted second degree murder, as charged in the amended bill of information. However, the trial transcript reveals that the trial court found the defendant guilty of the responsive offense of aggravated assault with a firearm. It is well-settled that in the event of a discrepancy between the minutes and the transcript, the transcript prevails. See State v. Lynch, 441 So. 2d 732, 734 (La. 1983).

[3] At the initial sentencing hearing, the trial court inadvertently stated that the defendant had been found guilty of aggravated second degree battery and read the sentencing provision for that offense before imposing a sentence of seven years imprisonment at hard labor. The trial court later resentenced the defendant on the correct offense, aggravated assault with a firearm, with the same sentence being imposed.

gunshots and that the gun, a black Glock, .40 caliber, semiautomatic handgun, was on the ground at the end of the driveway. The defendant explained that several vehicles had driven down his road, that one of them hit him, causing him to fall on the hood, and that he pulled out his gun to get the driver to stop. The defendant further stated that in the process of trying to stop the driver, his finger hit the trigger and the gunshots were fired into the vehicle. The officers secured the gun, read the defendant his rights, placed the defendant under arrest, and transported the defendant to the West Feliciana Parish Jail. The defendant had no visible injuries at the time.

The defendant provided a handwritten statement at the substation, wherein he contended that his sister, Tytianna Lee, had a conflict with Whitney Davis and Davis's associates. The defendant noted that he was informed that Davis and her associates threatened to hurt his sister and claimed to have "bats and stuff." The defendant indicated that an hour after he received this information, Davis and her cousin, Shieda Perkins, drove down his street, almost striking three people who were standing outside. The defendant indicated he was inside at that time. When he got outside, he saw four carloads of people. The defendant noted that he had his gun in his pocket, "Just in case something happen [sic]," and he walked to the end of his driveway. The defendant further wrote,

> [Shieda] was coming around the [corner] kinda fast so I try to move out the way. But I couldn't cause I can't run I had got shot like 10 yrs ago. So when [Shieda] coming I try to move fast enough so she wouldn't hit me she hit my left leg So I pull my gun out my pocket to make her stop and before I knew It I let off 3 shot to get off her hood of her car.

Handwritten statements, consistent with the defendant's account of the incident, were also provided by Tytianna Lee, James Soileau, and Davionne Mullen.

Mullen and Soileau also testified at trial, both indicating that they were outside with Tytianna Lee when the vehicle first came down the street, nearly

3

hitting them, and then kept going as they jumped out of the way to avoid being hit. Mullen stated that she went inside and told the defendant that they were almost hit by a car. She noted that the car came back around and stopped, as the defendant came outside and walked toward the driveway. According to Mullen, "after the situation escalated and he [the defendant] was walking around the car, and I remember him putting his hands up and the car went. And then that's when we heard gunshots and everybody was running all over the place." Soileau similarly contended that after they were nearly hit by the car, the defendant came outside and said, "What's going on?" He stated that by then, the car approached again and stopped in front of the house. Soileau stated that the driver accelerated, striking the defendant, and that the defendant fired shots, "as he was coming down from the air."

Carmette Hall, a neighbor who lived across the street in front of a cul-de-sac, called 911 to report the incident. Hall was watching television when he heard "a lot of talking outside." He looked out his window and saw a car making a circle. He added, "And what made me call, I thought he, you know, I thought the car had hit him..." Hall further testified that he heard at least two gunshots and backed away from the window at that point.

Deputy Wayne Tanner of the WFSD went to the hospital after being advised that a red Chevrolet sedan was en route to the hospital with a gunshot victim. Upon his arrival, he observed the vehicle in the parking lot with four bullet holes to the windshield. He photographed the damages to the vehicle. Deputy Tanner also took statements from witnesses at the hospital, including Whitney Davis and Marcus Harris, both of whom testified at the trial, along with Shieda Perkins, the victim and driver of the vehicle.

Davis and Harris testified that they were at Perkins' residence when they decided to take a ride. Davis sat in the front passenger seat while Harris sat in the

4

back, behind Perkins. Davis and Harris indicated that once they arrived in the defendant's neighborhood, Perkins drove down the street, made the circle and came back up the street before turning around and going back down the street. Davis added, "And once we were trying [sic] come around that last loop, then that's when we got shot at." Davis confirmed that the defendant's sister and Mullen were among the people who were outside at the time.[4] Davis stated that when the gunshots came through the windshield, she was looking at the defendant's sister, who she thought was trying to open the passenger-side door. Harris stated, "well, when we came around the circle the second time, he [the defendant] was standing in the middle of the street." He added, "And that's when [Perkins] start hitting the brakes because you can feel that car hitting brakes because all of a sudden it was leaning me forward ... Then, like I said, I heard four to five gunshots into the windshield." He confirmed that the defendant was the shooter.

Perkins testified that earlier that day, before the shooting, Tytianna Lee and her sister were driving down her "strip" (the dead-end street that she lived on) and harassing Davis. After dark, "strange cars" started passing by and there was a lot of traffic in the area. Perkins suggested that they "take a ride to see what's going on." However, they did not leave right away. Later, after Davis received a phone call from Tytianna Lee, Davis asked Perkins if she still wanted to take a ride, and they subsequently did so. Perkins stated that as they approached the area, she saw a lot of people at the end of the driveway of the Lee residence. She stated, "As I'm

---

[4]Toward the end of her testimony, Davis admitted that she and Tytianna Lee had had a dispute prior to the shooting and that when they stopped in front of the Lee residence, she believed at the time that Lee wanted to have a fight with her, so she rolled down the window and suggested that they "get it resolved" up the street, away from the Lee residence. She explained that she wanted to discuss the matter surrounding their dispute and "get this over," but did not want to have a confrontation in front of the residence, so she suggested, "let's just go up the street or something like that, just so we won't be around, anywhere around your property or anything like that, you know."

coming out of the circle, I can see Tytianna, like, flagging the car down." Perkins stated that when she went around the circle, apparently the second time around, her car was "ambushed." She stated that she saw "multiple fingers" in the window of her car and that Davis repeatedly told her to put the windows up. She added, "I heard the firecracker noise and I ... felt something, like, pop me." She stated that Davis screamed, "Hit the lock button." She added, "And then after I hit the lock button, all I can remember is hearing the gunshot go off, seeing Dawune standing in front of me with his, with his gun facing me, with his teeth showing his golds, pointing at me like this, biting his lip." She stated that she closed her eyes, adding "I think I passed out." Perkins testified that she was shot in her stomach, chest, wrist, and elbow.[5]

## ASSIGNMENTS OF ERROR

In a combined argument for his assignments of error, the defendant contends that the trial court imposed a constitutionally excessive sentence considering the "the totality of the evidence." He notes that he has a very minor criminal record with no prior felony convictions. He contends the trial court convicted him of aggravated assault with a firearm because the court was unclear whether it was actually the defendant who caused the victim's injuries. The defendant notes that the trial court did not find that he, in fact, shot the victim and caused her injuries, although he concedes that the trial court found that he pointed a gun at the victim's vehicle. He argues that the trial court subsequently erred, abused its discretion, and contradicted itself at sentencing in considering, as a "major aggravating factor," that the defendant's actions "resulted in the serious injury to the victim."

---

[5]The defendant introduced a grainy, black-and-white video surveillance of the Lee residence at trial. The brief footage shows an individual, presumably the defendant, standing in front of an approaching vehicle, extending his arms (his hands are not in clear view) and stepping backwards, as the vehicle appears to slowly bump into him. At that point, the vehicle and the defendant exceed the view of the camera. Just before the footage ends, the defendant reappears, walking away from the vehicle.

The defendant further argues that the trial court failed to consider mitigating evidence, specifically noting that: (1) as recognized by the trial court, the victim in this case, came to the neighborhood looking for trouble; (2) the video of the incident shows that the defendant was struck by the victim's vehicle; and (3) the events leading to this incident were initiated by the victim and her friends. Finally, the defendant notes that the offense for which he was convicted allows for a probated sentence and that he, as a first-time felony offender, is eligible for probation. Thus, he argues that the seven-year, "closer to the maximum" sentence is excessive in this case.

The State, in its appellee brief, argues that the trial court complied with the sentencing guidelines and adequately considered the defendant's background and the facts of the offense. The State notes that the record is devoid of any evidence that anyone else, other than the defendant, fired gunshots into the victim's vehicle that night. The State further notes that the trial court did not impose a maximum sentence in the case and argues that the trial court was within its broad discretion in imposing the sentence within the statutory sentencing range.

The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So. 2d 762, 767 (La. 1979); State v. Honea, 2018-0018 (La. App. 1st Cir. 12/21/18), 268 So. 3d 1117, 1120, writ not considered, 2019-00598 (La. 8/12/19), 279 So. 3d 915. A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. State v. Hurst, 99-2868 (La. App. 1st Cir. 10/3/00), 797 So. 2d 75, 83, writ denied, 2000-3053 (La. 10/5/01), 798 So. 2d 962. A sentence is grossly

7

disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. A trial court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by it should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Collins, 2009-1617 (La. App. 1st Cir. 2/12/10), 35 So. 3d 1103, 1108, writ denied, 2010-0606 (La. 10/8/10), 46 So. 3d 1265.

Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the district court to consider when imposing sentence. While the entire checklist of Article 894.1 need not be recited, the record must reflect that the district court adequately considered the criteria. In light of the criteria expressed by article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. State v. Brown, 2002-2231 (La. App. 1st Cir. 5/9/03), 849 So. 2d 566, 569. Remand is unnecessary when a sufficient factual basis for the sentence is shown. State v. Lanclos, 419 So. 2d 475, 478 (La. 1982); State v. Graham, 2002-1492 (La. App. 1st Cir. 2/14/03), 845 So. 2d 416, 422. Additionally, this court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders, or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. State v. Parker, 2012-1550 (La. App. 1st Cir. 4/26/13), 116 So. 3d 744, 754, writ denied, 2013-1200 (La. 11/22/13), 126 So. 3d 478.

At the initial sentencing hearing in this case, the victim testified that she suffered from depression and PTSD after watching the video of herself being shot. She stated that she had been living in fear since the night of the shooting, reliving the moment that the defendant "tried to take my life, take me away from my two young kids." She stated that she had an unrealistic sense of safety in St. Francisville before the shooting and did not realize the danger that she was putting

herself in. She stated that as a mother, she would never intentionally place herself in danger or go looking for trouble. She asked the trial court to impose the maximum sentence allowed by law.

Prior to imposing the sentence, the trial court noted its consideration of the sentencing guidelines and the presentence investigation report (PSI).[6] The trial court noted that it found no mitigating factors, though the court also noted that the defendant had a very minor history of criminal activity, with nothing as serious as the instant offense. As to the facts of the instant offense, the trial court noted that the defendant walked out of his house to a disturbance armed with a weapon and fired it into an oncoming vehicle. The trial court stated that while the defendant claimed to have been struck by the vehicle, such a fact was not clear from the evidence and further noted that the defendant, nonetheless, placed himself in front of the vehicle. The court also found the defendant knowingly created a risk of danger or harm to more than one person by firing his weapon into the driver's side of the vehicle. The trial court noted that the defendant used actual violence and a dangerous weapon in the commission of the offense. The trial court further considered, as an aggravating factor, the injuries suffered by the victim. In resentencing the defendant (after discovering the trial court error in naming the offense incorrectly prior to the original imposition of sentence, as previously noted herein), the trial court noted that the same sentencing reasons were applicable.

While the defendant describes his sentence as "closer to the maximum," we note that the applicable statute provides the following sentencing exposure: "fined not more than ten thousand dollars or imprisoned for not more than ten years, with

---

[6]The PSI indicates that the defendant is a first felony offender. His criminal record includes previous arrests for theft in 2005, simple battery in 2006, and domestic abuse battery in 2011. The report further contains handwritten notes indicating that the theft charge was dismissed and that no record was found for the simple battery arrest. On the domestic abuse battery charge, the defendant pled *nolo contendere* to simple battery and was sentenced to thirty days in parish prison.

or without hard labor, or both." LSA-R.S. 14:37.4(C). Thus, the defendant was exposed to an additional three years of imprisonment at hard labor as well as a significant fine. We find that the trial court provided well-thought-out reasons for its sentencing that did not conflict with the reasons for the trial court's verdict in this case. In light of the circumstances, the trial court, having presided over the trial and having heard all relevant facts and arguments, concluded that the aggravating circumstances outweighed any mitigating circumstances in this case. A thorough review of the record reveals that the trial court adequately considered the criteria of Article 894.1 and did not abuse its discretion in imposing the sentence herein. Therefore, we find no error in the trial court's denial of the motion to reconsider sentence. In accordance with the above, assignments of error numbers one and two lack merit.

## PATENT ERROR REVIEW

Pursuant to LSA-C.Cr.P. art. 920, this court routinely conducts a review for errors discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. After a careful review of the record, we have found a patent error.

Both the Sixth Amendment to the United States Constitution and La. Const. art. 1, § 17(A) guarantee an accused the right to a trial by jury in felony and certain misdemeanor cases. Except in capital cases, a defendant may knowingly and intelligently waive his right to trial by jury and elect to be tried by the judge. La. Const. art. 1, § 17(A); LSA-C.Cr.P. art. 780(A); LSA-C.Cr.P. art. 782(B). Accordingly, if a defendant is tried and convicted by a judge when he is entitled to a trial by jury, the record must show that a jury trial was knowingly and intelligently waived. See State v. Cappel, 525 So. 2d 335, 336-37 (La. App. 1st Cir.), writ denied, 531 So. 2d 468 (La. 1988).

10

The punishment for attempted second degree murder is confinement at hard labor. LSA-R.S. 14:30.1(B) and LSA-R.S. 14:27(D)(1)(a). Thus, the defendant was entitled to a jury trial on the charge in this case. La. Const. art. 1, § 17(A); LSA-C.Cr.P. art. 782(A).

The September 6, 2018 minutes of the arraignment reflect that the defendant was informed that he could be tried by the court alone or by a jury and that the case was assigned for the jury week of March 8, 2019. At the February 7, 2019 re-arraignment after the amendment of the bill of information, the trial court again informed the defendant that he could be tried by the court alone or by a jury and the defendant "maintained the trial by jury date for the week of March 18, 2019." On March 18, 2019, the matter was continued to the jury week of July 15, 2019. On July 18, 2019, the matter was tried by a bench trial. The record, however, does not contain a jury-trial waiver.

It is well settled that the waiver of a criminal defendant's right to trial by jury is not presumed; there operates, in fact, a presumption against such waiver that must be rebutted. Cappel, 525 So. 2d at 337. When the record does not clearly indicate a valid waiver of the right to a jury trial, the tendency has not been to reverse, but to remand the case to the trial court for an evidentiary hearing on the issue of whether a valid jury waiver was obtained. See State v. Nanlal, 97-0786 (La. 9/26/97), 701 So. 2d 963; State v. Chavis, 2011-1685 (La. App. 1st Cir. 5/2/12), 2012 WL 1550868, at *2. In Cappel, this Court noted that when the record is insufficient to determine whether the defendant knowingly and intelligently **waived** his right to a jury trial, testimony by the defendant and defense counsel at an evidentiary hearing would certainly be relevant, if not dispositive of the issue. Cappel, 525 So. 2d at 337 n.3.

Accordingly, the defendant's conviction and sentence are conditionally affirmed. We remand this case for the trial court to conduct an evidentiary hearing

11

within thirty days to determine whether the defendant knowingly and intelligently waived his right to a jury trial. If the evidence shows that the defendant did not execute such a waiver, the trial court is instructed to set aside the conviction and sentence and grant a new trial. We note that double jeopardy does not preclude the State from retrying a defendant whose conviction is set aside because of judicial error. See State v. Mayeax, 498 So. 2d 701, 705 (La. 1986). If, on the other hand, the trial court concludes that the defendant did waive his right to a jury trial, the defendant may appeal only that decision to this court. See State v. Welch, 2012-1531 (La. App. 1st Cir. 3/22/13), 115 So. 3d 490, 503-04; see also State v. Howard, 2009-928 (La. App. 5th Cir. 5/25/10), 37 So. 3d 1099, 1105.

Within ten days after the hearing, the trial court shall supplement the appeal record with the minutes and transcript of the evidentiary hearing, so that the defendant's appeal can continue to final disposition. State v. Lane, 2016-0942 (La. App. 1st Cir. 12/22/16), 2016 WL 7409682, at *2.

**CONVICTION AND SENTENCE CONDITIONALLY AFFIRMED; REMANDED WITH INSTRUCTIONS FOR DETERMINATION OF WHETHER DEFENDANT KNOWINGLY AND INTELLIGENTLY WAIVED HIS RIGHT TO A TRIAL BY JURY.**